NO. 94-427

IN THE SUPREME COURT OF THE STATE OF MONTANA

1996

STATE OF MONTANA,

    Plaintiff and Respondent,

v.

DANIEL FELIX FINLEY,

    Defendant and Appellant.

FILED

APR 16 1996

Ed Smith
CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and for the County of Lake,
The Honorable C.B. McNeil, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        William F. Hooks, Appellate Defender Office, Helena, Montana

    For Respondent:

        Joseph P. Mazurek, Attorney General, Cregg Coughlin, Assistant Attorney General, Helena, Montana; Kim Christopher, Lake County Attorney, Polson, Montana

Heard: December 19, 1995
Submitted: December 19, 1995

Decided: April 16, 1996

Filed:

_____
Clerk

Justice James C. Nelson delivered the Opinion of the Court

Daniel Felix Finley (Finley) appeals from the judgment and commitment entered by the Twentieth Judicial District Court, Lake county, for sexual intercourse without consent and for burglary. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

ISSUES

1. Did the prosecutor violate Finley's right to due process and privilege against self-incrimination by commenting on his postarrest silence and is this issue reviewable under the common law plain error doctrine?

2. Did the District Court err in failing to conduct a hearing on Finley's complaints about the effectiveness of his counsel's representation?

3. Did the District Court err by failing to appoint counsel to represent Finley during a post-trial hearing on counsel's effectiveness?

4. Did the District Court err in deferring determination of Finley's status as a dangerous or non-dangerous offender?

5. Did the District Court err in reserving its determination of Finley's parole eligibility?

BACKGROUND

On August 19, 1989, Finley and a friend went to a barbecue at Toni and T.J. Sias' home in Pablo, Montana. Finley had not met the hosts, Toni and T.J., prior to the party. Toni testified that Finley acted "flirty" around her during the course of the evening. After some of the guests left the Sias' home, Toni, T.J., Finley, and another guest went to Ronan to buy beer. Finley gave Toni money to buy the beer. On the ride back to Pablo, Finley sat in

2

the back seat of the car and allegedly played with Toni's hair and touched her shoulder.

At around 3:00 a.m., August 20, 1989, Toni and T.J. gave Finley a ride to his cousin's house in Pablo. Toni and T.J. testified that they returned home at about 3:30 a.m., showered, made up a bed on the couch in the living room, had sex, and went to sleep. Toni testified that she woke up because someone was on top of her and because she was falling off the couch. She stated that a man other than her husband had penetrated her vagina with his penis. Toni testified that she recognized Finley as he pulled up his pants and ran out the door.

T.J. testified that he woke up in time to see the hanging plant near the back door swing as if someone had just brushed by it. T.J. then followed Finley out the back door. Toni found Finley's hat, wallet (including Finley's driver's license), comb, and some change on the floor. T.J. took the items to the tribal law enforcement office.

Toni noticed that the electricity had been turned off at the breaker box and that Finley had dropped his nail clippers on the floor. An officer from the Lake County sheriff's department arrived at the Sias' trailer, met with a tribal officer, and collected the evidence T.J. had given to the tribal officer. The Lake County sheriff's officer spoke with Toni and T.J. and reported that they were both very upset. Toni gave the sheriff's officer a statement describing the evening's events. The sheriff's officer

found no clear finger prints on the breaker box, but did find on the back door, a print matching Finley's left thumb.

On September 25, 1989, Finley was charged by information with burglary and with sexual intercourse without consent in the Twentieth Judicial District Court, Lake County, and counsel was appointed to represent him. On December 29, 1989, Finley filed, pro se, a motion for a change of venue in which he complained about the assistance of his counsel. The District Court denied Finley's motion without a hearing. At the jury trial on March 5 and 6, 1990, Finley testified that he went to a barbecue at the Sias' home and that at some point in the evening, he went to use the bathroom because he thought he was going to get sick, but because the bathroom was so dirty, he opened the back door instead. He further testified that he remembered kissing Toni and being interrupted by T.J.

On cross-examination, the prosecutor asked the following questions:

Q. Mr. Finley, you haven't made any prior statements in this case at all, right?

A. Prior statements?

Q. Written or recorded statements to anyone?

A. Nobody has asked me.

.

Q. Okay, And you've gotten to hear all the testimony in the case today and yesterday, right?

A. Yes.

Q. This is the first time you've gone forward and told your tale; is that right?

4

A. Yeah.

In his initial closing statement, the prosecutor commented that Finley chose to say nothing before or after being arrested, but instead came forth with this exculpatory statement for the first time at trial. The prosecutor commented:

> The defendant gets on the stand and he says that -- first of all, he listens to all of the evidence -- and he doesn't have to make a statement. Then he comes in after he's heard everything and comes up with a story that he was invited back to the residence that night at 3:00 by two people who have never seen him before, with minor children there.

Finley's counsel did not make a contemporaneous objection to either the prosecutor's cross examination or to his closing comments. The jury found Finley guilty of burglary and sexual intercourse without consent.

After trial, Finley sent a handwritten letter to the Lake County Attorney's office accompanied with a statement from another inmate of the Lake County Jail. The documents contained the following assertions: counsel's representation was ineffective, counsel refused to discuss the terms of an appeal, and counsel refused to speak with Finley at all. On April 5, 1990, the State moved the District Court for a hearing on Finley's complaints of ineffective assistance of counsel. The District Court held a hearing wherein Finley's counsel examined the defendant and then testified in response to Finley's allegations. At the conclusion of the hearing, the District Court found that counsel had rendered effective assistance to Finley.

The District Court sentenced Finley to 20 years for each offense to run concurrently, with 5 years suspended. The District Court deferred its determination of Finley's status as a dangerous or non-dangerous offender under § 46-18-404(4), MCA, until such time as he might appear before the District Court for revocation of his suspended sentences. The trial court also reserved the right under § 46-18-202, MCA, to impose the restriction that Finley be ineligible for parole while serving his sentences in the event that he violated any condition of probation which resulted in revocation of his suspended sentence.

Finley's counsel did not file an appeal. Finley filed a pro se petition for postconviction relief alleging ineffective assistance of counsel for failure to perfect the appeal. On April 19, 1994, the District Court appointed the State Appellate Defender to represent Finley in his petition for postconviction relief. Subsequently, Finley moved to dismiss his petition for postconviction relief in the Lake County District Court in order to pursue a petition for postconviction relief with this Court. The District Court granted Finley's motion. Finley filed a petition for postconviction relief with this Court alleging that his trial counsel rendered ineffective assistance. On November 10, 1994, this Court granted an out-of-time appeal.

## DISCUSSION

1. Did the prosecutor violate Finley's right to due process and privilege against self-incrimination by commenting on his postarrest silence and is this issue reviewable under the common law plain error doctrine?

Finley concedes that his counsel failed to contemporaneously object to the prosecutor's comments at trial and that he is not able to meet the requirements of § 46-20-701(2), MCA, Montana's plain error statute. However, he urges this Court to invoke its discretionary power of common law plain error review on the premise that his claims of error affected his substantial rights and denied him a fair trial. The State contends that because Finley does not meet the requirements of the plain error statute, this Court is without authority to review on appeal his claims of error under this issue. Accordingly, in this case we are faced squarely with the question of whether the doctrine of common law plain error review can continue to survive given the existence of Montana's plain error statute. We conclude that it can and must.

Statutorily, § 46-20-104, MCA, establishes the scope of appeal by a criminal defendant. Specifically, § *46-20-104* (2), MCA, provides:

> Upon appeal from a judgment, the court may review the verdict or decision and any alleged error objected to which involves the merits or necessarily affects the judgment. *Failure to make* a timely objection *during trial constitutes a waiver of the objection except as provided in 46-20-701(2).* [Emphasis added.]

Section 46-20-701, MCA, was originally enacted in 1967, by the Montana Legislature, as a statutory exception to the legislative mandate that errors not objected to at trial would not be considered on appeal. As originally enacted, § 46-20-701, MCA, mirrored the federal plain error doctrine and, in essence, codified the common law doctrine of plain error. Subsequently, in 1983, the

7

legislature substantially amended the plain error statute. Section 46-20-701 (2), MCA,[1] now provides:

> (2) Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. No claim alleging an error affecting jurisdictional or constitutional rights may be noticed on appeal, if the alleged error was not objected to as provided in 46-20-104, unless the defendant [convicted person] establishes that the error was prejudicial as to his guilt or punishment and that:
> (a) the right asserted in the claim did not exist at the time of the trial and has been determined to be retroactive in its application;
> (b) the prosecutor, the judge, or a law enforcement agency suppressed evidence from the defendant [convicted person] or his attorney that prevented the claim from being raised and disposed of; or
> (c) material and controlling facts upon which the claim is predicated were not known to the defendant [convicted person1 or his attorney and could not have been ascertained by the exercise of reasonable diligence.

Montana's plain error statute uniquely restricts review of errors not objected to at trial. See, e.g., Rule 52(b), Fed.R.Crim.P.; Rule 52(b), North Dakota Rules of Criminal Procedure; Rule 615(a), Illinois Supreme Court Rules; Rule 30.20, Missouri Rules of Criminal Procedure

On the other hand, what might be referred to as the more conventional, unrestricted doctrine of plain error review has an extensive history in common law as well as in statute. The federal judiciary and many state courts invoke the common law doctrine of plain error to prevent manifest injustice. United States v. Makhlouta (9th Cir. 1986), 790 F.2d 1400; United States v. Barcenas (5th Cir. 1974), 498 F.2d 1110, cert. denied (1974), 419 U.S. 1036,

---

[1]We refer here to the 1995 version of the statute, which, with the addition of the "[convicted person]" language is identical to the version in effect at the time of Finley's trial in 1990.

95 S.Ct. 521, 42 L.Ed.2d 312; Armstrong v. People (Co. 1985), 701 P.2d 17; Russell v. State (Neb. 1995), 531 N.W.2d 212; Mitchell v. Class (S.D. 1994), 524 N.W.2d 860.

The United States Supreme Court adopted the common law doctrine of plain error in order to correct errors that affect the fundamental constitutional rights of defendants. Noting that the doctrine of plain error "confers a discretion that may be exercised at any time, no matter what may have been done at some other time," the Court stated that the doctrine is most appropriately invoked when "rights are asserted which are of such high character as to find expression and sanction in the Constitution or Bill of Rights." Weems v. United States (1910), 217 U.S. 349, 362, 30 S.Ct. 544, 547, 54 L.Ed. 793, 796; see also United States v. Smith (11th Cir. 1983), 700 F.2d 627, 633 (stating a court is more likely to review errors of constitutional magnitude). Adoption of the federal rules of criminal procedure ratified a federal appellate court's inherent power to notice errors that are obvious, or would seriously affect the fairness, integrity, or public reputation of judicial proceedings. United States v. Atkinson (1936), 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557.

State courts have also traditionally used this common law and statutory doctrine of plain error to correct obvious, fundamental, constitutional, or substantial errors. Whatever name a court chooses to use for the doctrine, courts invoke plain error review to correct error not objected to at trial but that affects the fairness, integrity, and public reputation of judicial proceedings.

9

The particular facts and circumstances of each case drive the applicability of I-he plain error doctrine. <u>Barcenas,</u> 498 F.2d at 1113.

Moreover, the power of such review is inherent in the appellate process itself. Appellate courts have the inherent duty to interpret the constitution and to protect individual rights set forth in the constitution and necessarily have the correlative authority to invoke the plain error doctrine in order to carry out those duties. See <u>Marbury</u> v. Madison (1803), 5 U.S. (1 Cranch) 368, 386-87; Laurence H. Tribe, American Constitutional Law § 3-5, at 21-34 (2 ed. 1987). This power to interpret the constitution and to protect individual rights stems from the constitution being the "fundamental and paramount law of the nation," that courts recognize and apply. <u>Marbury,</u> 5 U.S. at 383. "[T]he federal judiciary is supreme in the exposition of the law of the Constitution." Cooper v. Aaron (1958), 358 U.S. 1, 18, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5, 17. Similarly, a state's highest appellate court is supreme in the exposition of the law of that state's constitution. See State v. Leslie (1935), 100 Mont. 449, 454, 50 P.2d 959, 962 (the Montana Constitution "vests in the courts the exclusive power to construe and interpret legislative acts, as well as provisions of the Constitution."); State v. Toomey (1958), 135 Mont. 35, 44, 335 P.2d 1051, 1056 ("the office of interpreting legislative and constitutional provisions lies exclusively in the courts").

10

Montana's Constitution vests the judicial power of the State in the supreme court, district courts, justice courts, and such other courts as provided by law.  Art. VII, Sec. 1, Mont.Const. "The supreme court has appellate jurisdiction and may issue, hear, and determine writs appropriate thereto."  Art. VII, Sec. 2, Mont.Const.  Thus, the Montana Supreme Court has the inherent power and obligation to interpret the constitution, to protect individual rights, and, correspondingly, to review lower court decisions and actions for error.

This Court adopted the common law doctrine of plain error in a civil case, Halldorson v. Halldorson (1977), 175 Mont. 170, 573 P.2d 169.  <u>Halldorson</u> raised the constitutional issue of due process.  In <u>Halldorson,</u> the appellant argued that he was deprived of due process of the law because the district court terminated the trial and denied him his day in court.  <u>Halldorson,</u> 573 P.2d at 171.  The respondent argued that an objection raised for the first time on appeal is not timely and therefore the appellant waived any error by failing to object at trial.  This Court noted that although the doctrine of plain error had not been recognized in Montana, it had nationwide recognition in both federal and state jurisdictions.  This Court adopted the plain error doctrine by stating that:

> Ordinarily errors not raised below will not be considered on appeal, however this rule is subject to the exception that when the question is raised for the first time on appeal it relates to the fundamental rights of the parties. . . In adopting the "plain error" doctrine we believe that appellate courts have a duty to determine whether the parties before them have been denied substantial justice by the trial court, and when that has

11

occurred we can, within our sound discretion, consider whether the trial court has deprived a litigant of a fair and impartial. trial, even though no objection was made to the conduct during the trial.

Halldorson, 573 P.2d at 171.

In subsequent criminal cases, this Court has invoked the common law plain error doctrine to review claims of plain error and has, in other cases, declined to review claimed plain error based on the requirements of Montana's plain error statute. Unfortunately, we have not always done so in a consistent or particularly understandable fashion. Without going into each case, which is unnecessary to our decision here, we note, for example, that in State v. Wilkins (1987), 229 Mont. 78, 746 P.2d 588, a case involving the criminal sale of dangerous drugs, we observed that as a general rule, this Court will not entertain issues not raised at trial. However, we further noted that general rules are not without exception and that appellate courts may invoke the doctrine of plain error to prevent manifest injustice. Wilkins, 746 P.2d at 589. In Wilkins, this Court limited the application of the plain error doctrine to those cases where it is necessary to insure a fair and impartial trial. While this interpretation of the common law doctrine of plain error is compelling, the Court failed to discuss § 46-20-701(2), MCA, as substantially amended four years prior to our decision. Accordingly, Wilkins does not serve as particularly persuasive support for the continued existence of common law plain error review in the face of the restrictive requirements of § 46-20-701(2), MCA.

12

In State v. Voegele (1990), 243 Mont. 222, 793 P.2d 832, the defendant pleaded guilty to his third offense DUI. The Missoula county Attorney's office petitioned for revocation of the defendant's probation. The defendant made no objection to the petition, and the defendant admitted the violations of his probation. The defendant's appellate counsel appealed, contending that defendant's suspended sentence had expired when the petition to revoke was filed, thus the district court did not have jurisdiction over the matter. The State countered that absent objection below, the defendant was barred from challenging the court's jurisdiction. The defendant acknowledged that he could not meet the requirements of § 46-20-701(2), MCA. We held that discretionary review under the plain error doctrine provides a remedy to prevent manifest injustice and will only be used in exceptional cases. Voegele, 793 P.2d at 834. Because the jurisdictional error in Voegele was simply one of arithmetic, we invoked the plain error doctrine. The Court employed sound reasoning, but relied on Wilkins as authority.

In contrast, in State v. Rodgers (19931, 257 Mont. 413, 849 P.2d 1028, we chose not to invoke the plain error doctrine when the defendant asserted that the State engaged in prosecutorial misconduct. The defendant argued that despite his failure to raise any objections at the trial level, prosecutorial misconduct denied him his right to a fair trial as guaranteed by the Sixth Amendment of the United States Constitution and Article II, section 24 of the Montana Constitution. We restated our previous disapproval of the

13

prosecutor's characterizing the testimony of a witness as lies. However, we held that § 46-20-701(2), MCA, precluded us from considering an alleged error on appeal unless a timely objection had been made at trial, or unless the statutory criteria of § 46-20-701(2), MCA, had been met. Nevertheless, while we stated that a rule requiring objections at the trial level gives the trial court an opportunity to rule on the alleged error and gives the trial court the opportunity to correct itself, we also recognized our inherent power of discretionary review, and chose not to foreclose the option of invoking the plain error doctrine in a future case involving prosecutorial misconduct. Rodgers, 849 P.2d at 1032; see also State v. Arlington (1994), 265 Mont. 127, 875 P.2d 307.

In Arlington, although the defendant did not contemporaneously object to the prosecutor's alleged misconduct, he requested this Court to review the alleged error under the plain error doctrine. We held that the case did not represent the exceptional case envisioned to invoke the plain error doctrine and concluded that there was no evidence of any prosecutorial misconduct, much less plain error. Arlington, 875 P.2d at 322.

Given the history of our application of common law plain error review and application of § 46-20-701(2), MCA, in criminal cases, it is appropriate and necessary that we articulate an understandable rationale and rule for this and future cases. While we acknowledge the constraints of § 46-20-701(2), MCA, we also recognize our inherent power and paramount obligation to interpret

14

Montana's Constitution and to protect the various rights set forth in that document. Accordingly, we hold that this Court may discretionarily review claimed errors that implicate a criminal defendant's fundamental constitutional rights, even if no contemporaneous objection is made and notwithstanding the inapplicability of the § 46-20-701(2), MCA, criteria, where failing to review the claimed error at issue may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. In so holding, we do not rely on Halldorson, Wilkins, or their progeny, but rather on our inherent power of appellate review under Montana's Constitution. Moreover, given the legislature's obvious intention to restrict the use of plain error review by its enactment of § 46-20-701(2), MCA, we will henceforth use our inherent power of common law plain error review sparingly, on a case-by-case basis, and we will invoke that doctrine only in the class of cases aforementioned. In so doing, we reemphasize the necessity for contemporaneous objections to claimed error, and we caution counsel that, except in the class of cases mentioned, the provisions of § 46-20-701, MCA, will be applied in the absence of contemporaneous objection.

In the instant case, we conclude that Finley's claims of error implicate his right to due process of law and his privilege against self-incrimination, both undeniably fundamental constitutional rights. Given the importance of the legal issue raised and notwithstanding Finley's failure to contemporaneously object or to

15

bring his claims of error within § 46-20-701(2), MCA, our failure to review such claims may leave unsettled a question as to the fundamental fairness of his trial.

With that in mind, we next determine whether the prosecutor's comments violated Finley's right to due process of the law under the Fourteenth Amendment of the United States Constitution and Article II, section 17 of the Montana Constitution and his privilege against self-incrimination under the Fifth Amendment of the United States Constitution and Article II, section 25 of the Montana Constitution. Finley argues that the prosecutor's cross examination and closing argument impermissibly commented on his postarrest silence and thus violated his right to due process of the law as set forth in Doyle v. Ohio (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, and his privilege against self-incrimination. The State counters that Doyle is not applicable to the instant case because the record does not establish that the police advised Finley of his Miranda rights. The State also argues that a Fifth Amendment privilege against self-incrimination analysis does not apply in general to a prosecutor's comments on post-Miranda silence much less to Finley's postarrest silence.

In Doyle, the United States Supreme Court discussed the issue of whether a state prosecutor may seek to impeach a defendant's exculpatory story told for the first time at trial, by cross-examining the defendant about his or her failure to tell the story after receiving Miranda warnings at the time of arrest. Doyle, 426 U.S. at 616-17. The United States Supreme Court held that:

16

> While it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

Doyle, 426 U.S. at 618

The crux of the Court's reasoning in Doyle was the defendant's reliance on the Miranda warnings and the government's assurance that the defendant's silence would carry no penalty. For that reason, in Fletcher v. Weir (1982), 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490, the United States Supreme Court held that "[i]n the absence of the sort of affirmative assurances embodied in the Miranda warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." Fletcher, 455 U.S. at 607.

In Fletcher, the Court distinguished Doyle, noting that the record in Fletcher did not indicate that the defendant received any Miranda warnings, whereas in Doyle, the government induced silence by implicitly assuring the defendant that his silence would not be used against him. The Court was unwilling to broaden the Doyle analysis to an instance where the record did not support a conclusion that the police gave the defendant his Miranda rights. Fletcher, 455 U.S. at 605-06.

Similarly, in State v. Sadowski (1991), 247 Mont. 63, 76, 805 P.2d 537, 545, this Court chose not to broaden the Doyle analysis to include comments made on prearrest silence, i.e., before Miranda

17

warnings were given. We reasoned that <u>Doyle</u> was "based on principles of fundamental fairness that a defendant's silence *after* receipt of governmental assurances [would] not be used against him." <u>Sadowski,</u> 805 P.2d at 545 (citing State v. Furlong (1984), 213 Mont. 251, 258, 690 P.2d 986, 989). In <u>Sadowski</u>, this Court also held that there was no plain error or <u>Doyle</u> violation where the defense opened the door for the prosecutor's questioning on defendant's post-<u>Miranda</u> silence when the defendant raised the issue of his earlier silence and characterized it as proof of his innocence, and where he failed to object to the State's reference to that same silence, but then alleged that admission of such evidence constituted plain reversible error. <u>Sadowski,</u> *805* P.2d at *546.*

In <u>Furlong,</u> the defendant argued that the prosecutor's comments regarding the defendant's silence at the time of arrest, denied him due process of the law. We held that the <u>Doyle</u> analysis applied to and prohibited the State from seeking to impeach a defendant's exculpatory statement, told for the first time at trial, by commenting on the defendant's post-<u>Miranda</u> silence. <u>Furlong</u>, 690 P.2d at 989. In so holding, this Court reasoned that the <u>Doyle</u> analysis does not, however, apply to prearrest silence where the defendant has not been assured of the right to remain silent. <u>Furlong,</u> 690 P.2d at 989.

In the instant case, the record does not support a conclusion that Finley received any <u>Miranda</u> warnings. Therefore, without evidence supporting that he was assured of his right to remain

18

silent and a subsequent penalty for asserting that right, we hold that there was no Doyle error here.

Finley also contends, however, that the prosecutor's comments on his failure to give his exculpatory statements until trial, violated his privilege against self-incrimination under the Fifth Amendment of the United States Constitution, applicable to the states through the Fourteenth Amendment, and under Article II, section 25 of the Montana Constitution. The State contends that no United States Supreme Court opinion supports Finley's claim that adverse comments on post-Miranda silence violate the Fifth Amendment privilege against self-incrimination.

In Doyle, the defendants argued not only that the state violated their rights to due process but also argued that the state violated their Fifth Amendment privileges against self-incrimination. Doyle, 426 U.S. at 626. The majority of the Court found it unnecessary to reach the additional issue of defendant's privilege against self-incrimination. In his dissenting opinion, joined by Justices Blackmun and Rehnquist, Justice Stevens expressed no doubt of the propriety of the cross examination of the defendant's failure to mention the purported "frame" at the time of arrest, but noted that the questions regarding defendant's failure to generally mention the "frame" before trial presented a more difficult question. Nonetheless, he opined that following current United States Supreme Court jurisprudence, a state court is free to "regard the defendant's decision to take the stand as a waiver of his objection to the use of his failure to testify at an earlier

19

proceeding or his failure to offer his version of the events prior to trial." Doyle, 426 U.S. at 628-33.

In Jenkins v. Anderson (1980), 447 U.S. 231, 100 S.Ct. 45, 62 L.Ed.2d 30, the United States Supreme Court considered the question of whether "the use of *prearrest* silence to impeach a defendant's credibility violates either the Fifth or Fourteenth Amendment to the Constitution." Jenkins, 447 U.S. at 232 (emphasis added). In Jenkins, the prosecutor attempted to impeach the defendant's credibility by suggesting that the defendant would have spoken out if he had in fact killed in self defense. The Court noted that "[t]he Fifth Amendment guarantees an accused the right to remain silent during his criminal trial, and prevents the prosecution from commenting on the silence of a defendant who asserts the right." Jenkins, 447 U.S. at 235. In Jenkins, the defendant did not remain silent throughout the criminal proceeding, but instead voluntarily took the witness stand in his own defense. The Court held that inquiry into prior silence may be proper because the immunity from giving testimony is one which the defendant may waive by offering himself or herself as a witness. Jenkins, 447 U.S. at 235 (citing Raffel v. United States (1926), 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054). The Court concluded that the use of prearrest silence to impeach a criminal defendant's credibility does not violate the Fifth Amendment because the defendant is subject to cross examination impeaching his credibility just like any other witness. Jenkins, 447 U.S. at 237-38.

20

Here the prosecutor's comments regarding Finley's postarrest silence are similar to the prosecutor's comments regarding the defendant's prearrest silence in Jenkins because the comments were made before Finley was advised of any Miranda rights. In fact, the record here, does not show that Finley was ever advised of his Miranda rights. Finley voluntarily chose to take the stand, and as such, his credibility was subject to impeachment just like any other witness. While our opinion here should not be read as condoning the prosecutor's comments, in this instance where the record does not support a conclusion that Finley was advised of his Miranda rights, the comments did not infringe on his privilege against self-incrimination under either the Fifth Amendment or under Article II, section 25 of Montana's Constitution.

After reviewing the claimed violation of Finley's fundamental constitutional rights under the plain error doctrine, we conclude that the comments made by the prosecutor did not implicate Doyle error nor did such comments infringe upon Finley's privilege against self-incrimination

2. Did the District Court err in failing to conduct a hearing on Finley's complaints about the effectiveness of his counsel's representation?

Finley argues that when he filed a pro se motion for change of venue, the District Court erred in not conducting a hearing on Finley's complaints about the effectiveness of his counsel set forth in his motion. The State argues that a district court's duty to inquire into the adequacy of counsel extends only to motions for

21

substitution of counsel and that Finley's pro se motion sought a change of venue, not dismissal or substitution of counsel.

We have held that we look to the substance of the motion, not simply its title.  Miller v. Herbert (1995), 272 Mont. 132, 136, 900 P.2d 273, 275.  "The legal effect of any court-filed paper -- be it a motion, a pleading or some other instrument -- is to be measured by its content rather than by the author-provided title." Hulsey v. Mid-America Preferred Insurance Company (Okl. 1989), 777 P.2d 932, 936 n. 14.

In the instant case, Finley filed a pro se motion titled as a motion for change of venue.  However, the substance of the motion indicates that Finley was in fact complaining about the assistance of his counsel.  Finley listed six reasons for his motion.  In his reason number one, he complained that: "The accused does not feel comfortable and confident with the council [sic] [B.A.], accused feels he's not getting the Effective [sic] representation from [B.A.]"  In his reason number three, Finley complained that "Council [sic] has mentioned that he's worked for Lake Co. for two year's and has had no win's during his term in this office." And finally in his reason number four, Finley stated that he was told that there would be an investigation in this case on his behalf and that he felt that it was too late in the case to have an investigation on his behalf because the victims had a long time to get their statements straight. Under the circumstances, Finley's motion contained sufficient indicia that it was in substance a motion complaining of ineffective assistance of counsel, and we

22

**will treat it as** such. Finley contends that the District Court should have inquired into the validity of his complaints. We agree.

In State v. Morrison (1993), 257 Mont. 282, 284, 848 P.2d 514, 516, this Court discussed whether a district court erred in failing to hold a hearing regarding appellant's request for appointment of substitute counsel. The defendant in <u>Morrison</u> wrote to the district court approximately four months before trial complaining that his counsel had not yet spoken to him to prepare for his defense. The court ordered counsel to speak with the court and the defendant regarding the complaint. Defendant did not raise any other complaints until the sentencing hearings. At that time, he again complained of the lack of communication between himself and his attorney. <u>Morrison,</u> **848** P.2d at 516-17. We noted that a defendant has the right to "a meaningful client-attorney relationship." <u>Morrison,</u> 848 P.2d at 516 (citing State v. Enright (1988), 233 Mont. 225, **229, 758** P.2d 779, 782). "Upon a showing of a seemingly substantial complaint about counsel, the district court should conduct a hearing to determine the validity of the defendant 's **claim**" <u>Morrison,</u> **848** P.2d at 516.

In determining if defendant presented a seemingly substantial complaint about counsel, it follows that the district court **must** make an adequate inquiry into the defendant's complaints. In <u>Morrison,</u> we held that the defendant failed to present seemingly substantial complaints about his counsel and further that the district court made a sufficient inquiry into defendant's

**23**

complaints. <u>Morrison,</u> 848 P.2d at 517. However, in <u>Enright</u>, where the defendant was forced to choose between proceeding with ineffective assistance of counsel or proceeding pro se, we held that the district court's failure to conduct a hearing on defendant's seemingly substantial complaints inhibited informed appellate review. <u>Enright,</u> 758 P.2d at 782.

In determining whether Finley presented seemingly substantial complaints about the effectiveness of his counsel, the District Court should have inquired into the complaints and made some sort of a critical analysis at the time the motion was filed. The District Court failed to make an initial determination of whether Finley presented substantial complaints in his pro se motion, and accordingly erred in that respect. However, in this case, the District Court corrected its error by conducting a post-trial hearing on Finley's complaints regarding his counsel's representation. Accordingly, we conclude that the District Court's failure to hold a hearing at the time that Finley filed his pro se **motion** was harmless. See State v. Mix (1989), 239 Mont. 351, 356-57, 781 P.2d 751, 754.

3. Did the District Court err by failing to appoint counsel to represent Finley during a post-trial hearing on counsel's effectiveness?

Finley contends that the District Court denied him his right to counsel's undivided loyalty by failing to appoint counsel to represent him in the post-trial hearing on his counsel's effectiveness. Specifically, Finley argues that the District Court should not have allowed Finley's counsel to confront him regarding

24

the sufficiency of his allegations and then take the stand and rebut those allegations. The State counters that Finley did not challenge the District court's resolution of his complaints regarding the assistance of his counsel; that he, therefore, waived his right to appeal his counsel's conflict in loyalty; and that he "chose" to have the same counsel represent him though the sentencing hearing.

Additionally, Finley argues that because the District Court treated the post-trial hearing as a postconviction hearing, it had a duty pursuant to § 46-21-201(2), MCA, to appoint counsel for Finley. However, the State correctly notes in this regard that a postconviction hearing is a separate proceeding, available after a defendant has been sentenced, and applicable where there is no adequate remedy of appeal. See § 46-21-101, MCA. Moreover, § 46-21-201(2), MCA, was enacted in 1991, and therefore did not apply to the post-trial hearing held in April of 1990. Accordingly, we reject Finley's contention that he was entitled to appointment of counsel under § 46-21-201(2), MCA.

That does not end our inquiry, however. At the outset, we note that a trial court's decision whether to grant a motion for substitution of counsel is discretionary and will not be overturned on appeal absent a showing of abuse of discretion. Morrison, 848 P.2d at 516. On the facts here, we conclude that the trial court abused its discretion in not appointing counsel to represent Finley at the post-trial hearing.

25

The Sixth Amendment of the United States Constitution and Article II, section 24 of the Montana Constitution guarantee a criminal defendant the right to effective assistance of counsel. This right is comprised of two correlative rights, the right to counsel of reasonable competence and the right to counsel's undivided loyalty. State v. Christenson (1991), 250 Mont. 351, 355, 820 P.2d 1303, 1306 (citing McMann v. Richardson (1970), 397 U.S. 759, 770-71, 90 S.Ct. 1441, 1448-49, 25 L.Ed.2d 763, 773; and Wood v. Georgia (1981), 450 U.S. 261, 271-72, 101 S.Ct. 1097, 1103-04, 67 L.Ed.2d 220, 230).

The duty of loyalty is perhaps the most basic of counsel's duties, and breach of that duty is therefore accorded a presumption of prejudice if the defendant is able to show that (1) counsel actively represented conflicting interests, and (2) that an actual conflict of interest adversely affected counsel's performance. Christenson, 820 P.2d at 1306. Therefore, if a trial court determines that the defendant and his counsel have a conflict so great that it results in a total lack of communication or if counsel fails to render effective assistance, new counsel should be appointed. State v. Zackuse (1991), 250 Mont. 385, 385, 833 P.2d 142, 142.

Moreover, a criminal defendant's right to counsel arises at every critical stage of the proceedings against him. United States v. Wadsworth (9th Cir. 1987), 830 F.2d 1500, 1510 (citing Coleman v. Alabama (1970), 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387). This Court has defined a critical stage in a proceeding as "any

26

step of the proceeding where there is potential substantial prejudice to the defendant." State v. Robbins (1985), 218 Mont. 107, 111, 708 P.2d 227, 231.

In Robbins, the defendant contended that the district court did not appoint counsel for him prior to his arraignment and therefore denied his right to assistance of counsel during a critical stage of the proceedings against him. Robbins, 708 P.2d at 230. We noted that a defendant may challenge a district court's failure to provide counsel in any critical stage of the proceedings where potential substantial prejudice inheres in the absence of counsel. Robbins, 708 P.2d at 230.

Similarly, in Wadsworth, the defendant argued that the district court abused its discretion by refusing to grant his motion for substitution of counsel. During a hearing on the competency of the defendant's counsel, counsel defended his own actions when he should have represented the defendant by dedicating his sole efforts to the effective representation of his client's interests. Wadsworth, 830 F.2d at 1506. At the hearing, the district court asked the defendant to explain to the court what he felt was inadequate about his counsel. The district court then asked defendant's counsel to present his viewpoint on the matter. Wadsworth, 830 F.2d at 1507. The Ninth Circuit Court of Appeals concluded that the proceeding conducted by the district court on the defendant's motions resulted in the denial of the defendant's right to counsel at that hearing because the defendant was entitled to counsel at that critical stage of the proceedings against him.

27

Wadsworth, 830 F.2d at 1511. The Court of Appeals held that "the district court should have suspended the proceedings and appointed an attorney for the defendant at the competency of counsel hearing, as soon as it became apparent that [counsel] had taken an antagonistic position on a matter concerning his client's right to counsel and to prepare for trial." Wadsworth, 830 F.2d at 1511.

In the instant case, Finley's right to counsel attached at the post-trial hearing in which the District Court asked him to explain his complaints and then allowed his counsel to take the stand and rebut Finley's allegations. The potential for substantial prejudice to Finley existed at the post-trial hearing qualifying the hearing as a critical stage in the proceedings. Thus, Finley had a constitutional right to counsel at the post-trial hearing on his complaints of ineffectiveness of counsel.

In effect, Finley was without counsel at this point in the proceedings because his own attorney testified against him. We are not persuaded by the State's argument that Finley had to make a contemporaneous objection to his counsel's testimony or waive the right to appeal the issue. It is ludicrous to expect Finley, who was not representing himself as a pro se defendant, to have had the knowledge or wherewithal to object and therefore contradict the District Court and his counsel, especially where, as here, our review of the record demonstrates that he was clearly intimidated. Moreover, Finley's "choice" to proceed at sentencing with the counsel who had just testified against him or to represent himself, pro se was in reality, no choice at all. See Enright, 758 P.2d

782. The District Court erred by failing to appoint an attorney for Finley at the post-trial hearing when it became apparent that counsel was taking an antagonistic position toward his client. A conflict of interest such as the one present here, where counsel takes the stand in opposition to his client and to rebut his client's allegations of ineffectiveness, renders the assistance of that counsel ineffective for purposes of that proceeding. The District Court should have determined that Finley and his counsel had a conflict so great that Finley should be appointed new counsel, at least for purposes of the competency hearing. Because a presumption of prejudice extends to conflicts such as the one between Finley and his counsel, we conclude that the District Court abused its discretion by failing to appoint counsel to represent him at the post-trial hearing under the circumstances here.

Since Finley did not have effective assistance of counsel at the post-trial hearing, we conclude that it is appropriate that the trial court appoint him new counsel and rehear his claims of ineffectiveness, and we remand for further proceedings in this regard.

4. Did the District Court err in deferring determination of Finley's status as a dangerous or non-dangerous offender?

We address this issue and issue five in the event that after rehearing the trial court determines Finley's claims of ineffective assistance of counsel not to be meritorious. In that event, the court will nonetheless have to correct its sentencing order in accordance with this opinion.

Finley argues that the District Court did not have the power to defer determination of his status as a dangerous or non-dangerous offender because at the time he was *charged,* Montana's statutory scheme did not allow the District Court this option. The State counters that § 46-18-404, MCA, in effect at the **time** of Finley's *sentencing,* grants the District Court the authority to defer its determination to designate the defendant dangerous or non-dangerous. Neither Finley nor the State are correct.

A district court has broad discretion to determine appropriate punishment. State v. Hembd (1992), 254 Mont. 407, 411, 838 P.2d 412, 415. Moreover, district courts have broad discretion in their sentencing decisions. State v. Alexander (1994), 265 Mont. 192, *203, 875* P.2d 345, 352. Nevertheless, "[w]e have long held that a district court has no power to impose a sentence in the absence of specific statutory authority." State v. Hatfield (1993), 256 Mont. *340, 346, 846* P.2d 1025, 1029.

We have also held that the law in effect at *the time of the commission of the* crime *controls* as to the possible sentence. State v. Stevens (Mont. 1995), 904 P.2d 590, 592, 52 St.Rep. 1078, 1079 (citing State v. Azure (1978), 179 Mont. 281, 282, 587 P.2d 1297, 1298). In Azure, the defendant appealed from a sentence imposed on him following conviction of mitigated deliberate homicide. Azure, *587* P.2d at 1298. The sole issue on appeal was whether a statute not in force at the time the offense was committed *was ex post facto* as applied to defendant. The statute at issue eliminated or delayed a defendant's parole eligibility

after a criminal offense had been committed. In Azure, we held that the application of statutes enacted after the offense had been committed was *ex post facto.* Azure 587 P.2d at 1298 (citing State v. Gone (1978), 179 Mont. 271, 587 P.2d 1291).

In State v. Suiste (1993), 261 Mont. 251, 255, 862 P.2d 399, 402, we held that the defendant was entitled to be sentenced under the statute applicable at the time of his original sentencing. Consequently, we remanded for sentencing under the statute in effect at that time. Similarly, in Rose v. McCormick (1992), 253 Mont. 347, 349, 834 P.2d 1377, 1378, we held that the statute in effect at the time of sentencing was the applicable statute. Given our decision in Azure, neither Suiste nor Rose were correct in stating that the applicable statutes were those in effect at the **time** of "sentencing." However, in both Suiste and Rose, the statutes in effect at the original sentencings were the same statutes that were in effect at the time the crimes were committed. Thus we reached the correct result in both cases.

In the instant case, Finley committed the offenses in question on August 20, 1989. At that time, § 46-18-404, MCA, did not grant the District Court authority to defer determination of Finley's dangerous or non-dangerous offender status. In 1989, the legislature amended § 46-18-404, MCA, to provide "[i]f an offender is given a probationary sentence that is subsequently revoked, the court may make the determination of whether the offender is a dangerous or non-dangerous offender at the time of the revocation proceeding." This amendment, however, did not become effective

*31*

until October 1, 1989. Accordingly, under the version of § 46-18-404, MCA, in effect when Finley committed his crimes, the District Court had no authority to defer determination of Finley's status as a dangerous or non-dangerous offender. Therefore, the District Court erred in deferring its determination of Finley's status as a dangerous or non-dangerous defender, and we reverse this portion of Finley's sentence

5. Did the District Court err in reserving its determination of Finley's parole eligibility?

Finley also contends that the District Court did not have statutory authority under § 46-18-202, MCA, to reserve the right to restrict his eligibility for parole. The State agrees that the District Court was not authorized to reserve the right to restrict Finley's parole eligibility. Therefore, we reverse on this issue as well.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

32

Justice Karla M. Gray, specially concurring.

I concur in the Court's opinion on issues two through five. I specially concur in that opinion on issue one by agreeing with the result reached, namely that the issue does not present reversible reviewable error. I also agree with the Court's analysis and resolution of the _Doyle_-related question contained in issue one. I disagree entirely that the _Doyle_ question is reviewable under the common law plain error doctrine and with the Court's plain error analysis.

It is my view that this Court's clear duty is to apply § 46-20-701(2), MCA, as duly enacted by the Montana Legislature, unless and until a constitutional challenge to that statute is mounted and succeeds. No such challenge is presented in this case. As a result, we are obligated to apply § 46-20-701(2), MCA, as written. Rather than do so, the Court continues down the erroneous and confusing path it charted long ago of relying on the statute when the statute suits us and falling back on the common law plain error doctrine when we do not desire to be bound by the statute. Such a path is, in my view, legal error; it also at least suggests to attorneys and the public that this is a result-oriented Court; and finally, it creates inconsistency and instability in the law, leaving practitioners at a loss as to the applicable law. I cannot join my brethren on such a path.

I appreciate the Court's candor in setting forth some of the shortcomings of our earlier cases addressing the common law plain error doctrine and/or § 46-20-701, MCA. I applaud the Court's good

33

faith effort to limit the damage it creates through its journeys down this path by "articulat[ing] an understandable rationale and rule for this and future cases."  I am unpersuaded, however, that the "new" rationale and rule are any more understandable than the "old;" they do not appear to be any more limited.

The Court's "new" common law plain error doctrine permits us to review, in our discretion,

> claimed errors that implicate a criminal defendant's fundamental constitutional rights, even if no contemporaneous objection is made and notwithstanding the inapplicability of the § 46-20-701(2), MCA, criteria, where failing to review the claimed error at issue may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process.

The intended clarity of this rule escapes me.  Like the earlier editions of the Court's plain error doctrine, this articulation essentially **seems** to boil down to claimed errors affecting jurisdictional or constitutional rights.  The problem is that § 46-20-701(2), MCA, permits us to review a "claim alleging an error affecting  jurisdictional or constitutional rights" to which no objection was made only where the defendant establishes that the error was prejudicial and one of the situations specified in § 46-20-701(2) (a)-(c), MCA, exists.  It is undisputed that none of those situations exists in this case.  Thus, it is my view that the statute precludes our review of the Doyle-related claim raised here on appeal.

I do not disagree with some of the Court's statements about our authority under the Montana Constitution.  However, the Montana Constitution also divides the power of the government of this State

34

into three separate and distinct branches: legislative, executive, and judicial. Art. III, Sec. 1, Mont.Const. In addition, it provides that

> [n]o person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.

Art. III, Sec. 1, Mont.Const.

"The legislative power is vested in a legislature. ." Article V, Sec. 1, Mont. Const. The Legislature has exercised its power to enact a statute; absent a successful constitutional challenge to the propriety of that statute, we are obligated to apply it. Instead, while stating its "acknowledg[ment of] the constraints of § 46-20-701(2), MCA," the Court indulges in the luxury of selectively quoting from the Constitution in order to allow itself to continue to ignore a statute presumed valid in the absence of a successful constitutional challenge. It is cases such as these, and actions such as this, which rightly result in the Legislature's anger, frustration and indignation with this Court.

_____
Justice

35

Justice Charles E. Erdmann specially concurring.

I concur with Justice Nelson on Issues 2, 4, and 5. I join in Justice Gray's special concurrence on Issue 1, and I specially concur with Justice Nelson's holding on Issue 3 to emphasize what I believe should be the narrow scope of its holding.

This Court has previously held that if a trial court determines that the defendant and his counsel have a conflict so great that it results in a total lack of communication, or if counsel fails to render effective assistance, new counsel should be appointed. State v. Zackuse (1991), 250 Mont. 385, 385, 833 P.2d 142, 142 (citing State v. Marts (1988), 233 Mont. 136, 139-40, 760 P.2d 65, 67; State v. Pepperling (1978), 177 Mont. 464, 472-73, 582 P.2d 341, 346).

In the present case, the District Court conducted a post-trial hearing to determine the effectiveness of Finley's counsel. The court asked Finley to explain his complaints about his lawyer and then allowed Finley's counsel to take the stand and rebut the allegations. I agree with Justice Nelson when he states that a "conflict of interest such as the one present here, where counsel takes the stand in opposition to his client and to rebut his client's allegations of ineffectiveness, renders the assistance of that counsel ineffective for purposes of that proceeding." I therefore concur with the Court's opinion that the District Court should have determined that Finley and his counsel had a conflict of interest so great that Finley should have been appointed new counsel, at least for the purpose of the competency hearing.

36

I write separately to emphasize that the Court's opinion correctly qualifies its holding by stating that "[o]n the facts here,we conclude that the trial court abused its discretion in not appointing counsel to represent Finley at the post-trial hearing." (Emphasis added.) This Court's long-standing rule for determining when a district court should appoint new counsel when allegations of ineffective assistance of counsel are made is set forth in Zackuse and should remain intact. The Court's opinion should not be read to require appointment of new counsel whenever an allegation of ineffective assistance of counsel is made in district court.

_____
                Justice

37

Justice W. William Leaphart, dissenting.

Although I agree with the Court's analysis of the plain error doctrine, I dissent from the Court's conclusion, under Issue 1, that the prosecutor's comments about Finley's post-arrest silence did not violate his rights under Art. II, Sec. 25, of the Montana Constitution. The Court correctly cites State v. Jackson (1983), 206 Mont. 338, 348, 672 P.2d 255, 259, for the proposition that the Montana constitutional privilege against self-incrimination "affords no greater protection than that of the Federal Constitution." Based upon the premise that Montana's constitutional privilege against self-incrimination parallels that of the United States Constitution, the Court concludes that it is bound by the precedent of the United States Supreme Court to the effect that prosecutorial comment on pre-arrest or post-arrest (pre-Miranda) silence does not violate either the protection against self-incrimination or due process of law. Fletcher v. Weir (1982), 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490; Jenkins v. Anderson (1980), 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86.

While I acknowledge that the Court has correctly cited our precedent for the proposition that Montana's privilege against self-incrimination affords no greater protection than the 5th Amendment of the U.S. Constitution, I disagree with that premise. I would overrule that line of authority and hold that Art. II, Sec. 25 of our Constitution, like Art. II, Sec. 10 (Right of Privacy) and Sec. 11 (Freedom from unreasonable searches) is independent of the U.S. Constitution and affords more protection than its federal

38

counterpart. See State v. Sierra (1985), 214 Mont. 472, 476, 692 P.2d 1273, 1276, in which we held:

> As long as we guarantee the minimum rights guaranteed by the United States Constitution, we are not compelled to march lock-step with pronouncements of the United States Supreme Court if our own constitutional provisions call for more individual rights protection than that guaranteed by the United States Constitution.

In Sierra, we relied upon the Alaska decision in Reeves v. State (Alaska 1979), 599 P.2d 727, and said: "The [Alaska] court noted as we have done before, that their state constitutional guarantee against unreasonable searches and seizures was broader in scope than the Fourth Amendment to the United States Constitution." Sierra, 692 P.2d at 1276. See also State v. Bullock (1995), 272 Mont. 361, 901 P.2d 61 (involving Montana's Art. II, Sec. 10, right of privacy).

We are no more compelled to "march lock-step with pronouncements of the United States Supreme Court" concerning the 5th Amendment right against self-incrimination than we are with that Court's pronouncements concerning the 4th Amendment's right to be free from unreasonable searches and seizures. Our decisions holding that Art. II, Sec. 25, affords no more protection than does the 5th Amendment offer absolutely no analysis in support of this proposition. Rather, they are based upon our holding in State v. Anderson (1970), 156 Mont. 122, 476 P.2d 780. Anderson, again without any analysis or rationale, held that Montana's 1889 Constitution, Art. III, Sec. 18, "affords a defendant no greater protection than the federal guaranty." Anderson, 476 P.2d at 782. Anderson was decided two years prior to the adoption of our present constitution in 1972 and thus offers no guidance in determining

whether the framers of the 1972 constitution intended to delegate interpretation of the Montana Constitution entirely to the nine Justices in Washington, D.C. I believe that the preferable approach to interpreting our constitutional provision is reflected in our decisions in <u>Sierra</u> and <u>Bullock.</u> That is, so long as we guarantee the minimum rights guaranteed by the U.S. Constitution, we are not only free but duty bound to interpret our parallel provisions consistently with what we determine to have been the intent of the framers of the 1972 Montana Constitution and the citizens of the State of Montana.

Based upon my view that Art. II, Sec. 25, is broader than the 5th Amendment, I would then follow the lead of the Wyoming Supreme Court in Westmark v. State (Wyo. 1984), 693 P.2d 220. In <u>Westmark,</u> the Wyoming court held that the right against self-incrimination under the Wyoming constitution was broader than the 5th Amendment; that Westmark's right to remain silent was not dependent upon being advised of that right through *Miranda* warnings or otherwise, and, thus, a prosecutor's comments during cross-examination and closing argument regarding Westmark's silence violated his right to remain silent under the Wyoming Constitution. <u>Westmark,</u> 693 P.2d at 222-23. The Wyoming court cited its prior decision in Clenin v. State (Wyo. 1978), 573 P.2d 844, a case in which the record did not indicate whether Clenin had been advised of his rights by the law enforcement officer, for the following proposition:

> The right of an accused to remain silent, however, under Art. 1, § 11 of the Constitution of the State of Wyoming, which provides: "No person shall be compelled to testify against himself in any criminal case, * * * ," does not depend upon his being advised of that right, but exists by virtue of the constitutional language. Advice as to

> that right by law enforcement officers or by the justice
> of the peace or by the judge of the district court is
> only for the purpose of expanding its protection by
> assuring that the accused person is aware of it.

Clenin, 573 P.2d at 846. In Westmark, the Wyoming court concluded that Art. 1, § 11, of the Wyoming Constitution "brings with it the implicit assurance that silence will carry no penalty and therefore it would be 'unfair and a deprivation of due process' to permit the defendant's silence to be used to impeach his exculpatory testimony offered at trial." Westmark, 693 P.2d at 222 (quoting Doyle v. Ohio (1976), 426 U.S. 610, 618, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91, 98.

Without addressing the question of pre-arrest silence, I am of the view that when, as here, a person is arrested, he becomes an "accused" and his constitutional right to remain silent and not incriminate himself is triggered regardless of whether he is advised of his rights through *Miranda* warnings or otherwise. I am not willing to concede that our right to remain silent does not come into play unless we have been advised of that right. To the contrary, the right not to incriminate oneself exists, not because one has been advised of the right by a law enforcement officer or government functionary, but because the right is spelled out in our constitution. As the Wyoming court points out in Westmark, advice as to the right merely expands its protection by assuring the accused person is aware of the right. The right, however, is carved in the stone of our constitution and, like the right to freedom of speech or religion, it exists regardless of our awareness or ignorance. If our citizens only have the benefit of those constitutional rights of which they are aware, very few of

41

them would enjoy any constitutional protection at all. Presumed ignorance, of course, is the very reason that *Miranda* warnings are required before an accused person can be interrogated.

Here, the Court concludes that since Finley voluntarily chose to take the stand, his credibility was subject to impeachment just like any other witness. While I agree that Finley's testimony offered at trial is subject to cross-examination, I do not agree with the Court's equating of post-arrest silence with pre-arrest silence or pre-arrest inconsistent statements as an impeachment tool. Finley's choice to take the stand should not expose him to impeachment for having remained silent at an earlier time when he, as a post-arrest accused person, was under no obligation to speak. Post-arrest silence is very different from pre-arrest silence. As Justice Marshall pointed out in United States v. Hale (1975), 422 *U.S. 171, 177,* 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99, *105,* the circumstances surrounding an arrest lead the defendant to silence.

> At the time of arrest and during custodial interrogation, innocent and guilty alike--perhaps particularly the innocent--may find the situation so intimidating that they may choose to stand mute. A variety of reasons may influence that decision. In these often emotional and confusing circumstances, a suspect may not have heard or fully understood the question, or may have felt there was no need to reply. See *Traynor,* The Devils of Due Process in Criminal Detection, Detention, and Trial, 33 U.Chi.L. *Rev. 657, 676* (1966). He may have maintained silence out of fear or unwillingness to incriminate another. Or the arrestee may simply react with silence in response to the hostile and perhaps unfamiliar atmosphere surrounding his detention.

In <u>Doyle</u> the United States Supreme Court held that it would be unfair to give *Miranda* warnings, including the right to remain silent, and then impeach the defendant at trial with the silence that was induced by the warning. <u>Doyle,</u> 426 U.S. 610. In my view,

the government's actions in arresting a person are no less of an inducement to silence than a *Miranda* warning, and the use of post-arrest, *pre-Miranda* silence for impeachment gives rise to the same unfairness that is the basis for the Doyle rationale.

*Miranda* warnings are not required where a suspect is simply taken into custody. Rather, they come into play when the suspect is subjected to custodial interrogation. Rhode Island v. Innis (1980), 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297, *307.* Thus, if the arresting officers wait a period of time after the arrest before giving the *Miranda* warnings, the suspect's silence during that interim time period (post-arrest, *pre-Miranda)* will subject him to impeachment. If police officers give the *Miranda* warnings at the time of arrest, which, although not legally mandated, is the standard practice, that same silence, under Doyle, can not be used to impeach. The Court's decision herein will thus encourage law enforcement personnel to postpone the giving of *Miranda* warnings in order to create a period of post-arrest, pre-*Miranda* silence which can be used for impeachment.

It is ironic indeed when a person can be impeached for having exercised his constitutional right to remain silent after having been arrested. I would hold that the prosecutor's comments about Finley's post-arrest silence violated his rights under Art. II, *Sec. 25,* of the Montana Constitution and constituted prejudicial error. In light of my views on Issue 1, I would not have to reach Issues 2 through 5. If I were to address Issues 2 through 5, I would concur with the views expressed in the Court's opinion.

_____
Justice

Justices Terry N. Trieweiler and William E. Hunt, Sr., join in the foregoing dissent of Justice W. William Leaphart.

_____
J stice

_____
Justice

44