No. 98-213

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 62

STATE OF MONTANA,

Plaintiff and Respondent,

v.

AMUIR SEKOU CLAUSELL,

Defendant and Appellant.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Kevin Gillen, Billings, Montana

For Respondent:

Joseph P. Mazurek, Montana Attorney General, C. Mark Fowler, Assistant Montana Attorney General, Helena, Montana; Dennis Paxinos, Yellowstone County Attorney, Daniel Schwarz, Chief Deputy Yellowstone County Attorney, Billings, Montana

Submitted on Briefs: March 16, 2000
Decided: April 18, 2001

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Amuir Sekou Clausell appeals from the judgment of conviction and sentence entered by the Thirteenth Judicial District Court, Yellowstone County, on a jury verdict finding him guilty of deliberate homicide. We affirm.

¶2 We address the following issues on appeal:

¶3 1. Did the District Court err when it admitted expert testimony of Dr. Dwayne Schultz?

¶4 2. Did the District Court err when it denied Clausell's motion for a directed verdict of acquittal?

¶5 3. Did the District Court erroneously instruct the jury on the definition of "purposely?"

¶6 4. Did the State prejudice Clausell's right to a fair and impartial trial by commenting on facts not of record?

¶7 5. Did the District Court err when it admitted the testimony of police officer Steve Swanson regarding pre-*Miranda* statements made by Clausell?

¶8 6. Did the State violate Clausell's right to due process and privilege against self-incrimination by commenting on Clausell's post-*Miranda* silence and is this issue reviewable under the common law plain error doctrine?

## BACKGROUND

¶9 At approximately 3:00 a.m. on March 22, 1997, Amuir Clausell arrived at the emergency room of Saint Vincent Hospital in Billings and informed hospital personnel that his girlfriend had a head injury and he needed help getting her out of his car. Emergency medical technicians who responded found Georgiana Trottier in the car, unconscious and with a single gunshot wound to the head. Trottier never regained consciousness and later died of the gunshot wound.

¶10 Clausell initially told medical personnel that Trottier called him from a gas station, told him she was injured and drove herself to Clausell's apartment. He said he found her outside his apartment and drove her to the hospital. Clausell stayed at the hospital while Trottier was being treated and Billings police officers eventually arrived and questioned him. Over the course of the morning and during the ensuing investigation, Clausell recounted at least eight different versions of the story to hospital personnel, police and two friends who testified at trial.

¶11 Clausell was ultimately arrested on the morning of March 22, and Billings police searched his apartment. Detectives found bloodstained blankets on Clausell's bed and blood on the bed, floor and wall of the bedroom as well as on the stairs and handrail leading from the bedroom to the main apartment. Blood samples taken from the apartment matched Trottier's blood. Immediately outside the back door to Clausell's apartment, wrapped in a towel inside a bucket, detectives found a .22 caliber pistol with one spent round in the chamber. In Clausell's bedroom, detectives found .22 caliber ammunition as well as a life insurance policy, held by Trottier, naming Clausell as the primary beneficiary.

¶12 On March 27, 1997, the State charged Clausell by information with Felony Accountability for Deliberate Homicide in violation of § 45-2-302(3), MCA, and § 45-5-102, MCA. The State amended the information on August 6, 1997, to Felony Deliberate Homicide in violation of § 45-5-102(1)(a), MCA. Clausell pled not guilty and a jury trial commenced October 20, 1997.

¶13 Several witnesses testified at Clausell's trial regarding the events of March 21, 1997, leading up to the shooting. Tyson Byers, a bouncer at the Lamplighter Lounge in Billings testified that Trottier and Clausell spoke at the Lamplighter on the evening of March 21, had an argument and had to be physically separated from each other. A second bouncer, James Phillip "Hawkeye" Hochmuth, testified that after the altercation, he asked Trottier to leave the bar and she left with her friend Tara Haker.

¶14 Haker testified that she had been with Trottier at the Lamplighter that evening, that the two had eventually returned to Haker's house and that Trottier left for her own home between 2:00 and 2:30 a.m. Rather than go home, however, Trottier drove to Clausell's apartment. Toni Devous, one of Clausell's neighbors, testified that she awoke to Trottier yelling and banging on Clausell's door at 2:30 a.m. Devous testified that she told Trottier to leave Clausell alone or at least to go somewhere and call him. Trottier exchanged words

with Devous and then left. Devous testified that she heard Trottier return a short while later and enter the apartment and that she heard some brief yelling and then silence.

¶15 Testifying on his own behalf, Clausell admitted he and Trottier had an intimate relationship but asserted it was not as serious as she wanted it to be. He testified that they fought at the Lamplighter on the evening of March 21, and that she came to his apartment later that night asking if she could stay with him but he refused. According to the account Clausell gave at trial, Trottier then went upstairs demanding some of her belongings and he went downstairs to get a glass of water; when he returned to his bedroom, Trottier was lying face down on his bed again asking if she could stay. Clausell testified he grabbed her by her wrists and arms and attempted to pull her off the bed when the gun, which he ordinarily kept by his bed, discharged. Clausell testified that Trottier was holding the gun but he never saw it due to the poor light and the fact he was not wearing his glasses. According to Clausell, he then put his clothes on and carried her outside, dropping the gun in the bucket on the way out, found her keys in her car and drove her to the hospital.

¶16 Dr. Dwayne Schultz, a pathologist at Saint Vincent Hospital, testified that Trottier died as a result of a bullet wound to the back of her head. Dr. Schultz testified that he found soot and powder from the bullet inside Trottier's skull and brain, indicating the gun had been discharged at close range. Dr. Schultz also explained that the bullet entered at a complex angle beginning two inches behind the left ear and one inch below the top of the ear, a fact which Dr. Schultz opined would have made it difficult for Trottier to have inflicted the wound herself. Finally, Dr. Schultz testified that the bullet essentially exploded Trottier's cerebellum, precluding any further voluntary motor functions after she was shot.

¶17 After a four-day trial, the jury convicted Clausell of deliberate homicide. On January 7, 1998, the District Court entered judgment on the verdict and sentenced Clausell to 100 years in the Montana State Prison plus an additional 2 years, running consecutively, for the use of a weapon. Clausell appeals.

## DISCUSSION

¶18 **1. Did the District Court err when it admitted expert testimony of Dr. Dwayne Schultz?**

¶19 During its case-in-chief, the State offered the expert testimony of Dr. Dwayne Schultz. In seeking to establish his qualifications as an expert, Dr. Schultz testified that he was

board certified in Pathology and that he had conducted over four hundred autopsies, approximately forty of which involved gunshot wounds. In response to voir dire by defense counsel, Dr. Schultz admitted he was not board certified in Forensic Pathology. Clausell's attorney then asserted the following objection: "I would object to this Doctor's testimony regarding Forensic Pathology which would include discussions about homicide cases . . . ." The District Court overruled the objection and Dr. Schultz testified, among other things, as to the cause of Trottier's death, the presence of soot and powder burns in her skull and brain, the trajectory of the bullet through her skull and brain, and the probable orientation of the gun when it was fired in order for the bullet to achieve its trajectory. Clausell did not object further to any of Dr. Schultz's testimony.

¶20 On appeal, Clausell contends "only a forensic pathologist should be considered a qualified expert to testify concerning the cause of death where there is a suspicious circumstance surrounding the death as presented in this trial for deliberate homicide." Thus, Clausell appears to argue the District Court erred in accepting the qualifications of Dr. Schultz as an expert witness. Clausell also argues the District Court erred specifically in allowing Schultz to testify regarding the forensic aspects of Trottier's death--the presence of soot and powder burns in the bullet wound, the trajectory and angle of the bullet and the likely orientation of the gun when it was fired. We address both arguments in turn.

¶21 Rule 702, M.R.Evid., sets forth the criteria for the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

The determination of the qualification and competency of an expert witness rests within the sound discretion of the trial court and will not be disturbed absent a showing of abuse of discretion. *State v. Maier*, 1999 MT 51, ¶ 88, 293 Mont. 403, ¶ 88, 977 P.2d 298, ¶ 88 (citation omitted). Moreover, "[t]he degree of a witness' qualifications affects the weight of the expert's testimony, not its admissibility." *State v. Martin* (1987), 226 Mont. 463, 466, 736 P.2d 477, 479 (citing *State v. Berg* (1985), 215 Mont. 431, 434, 697 P.2d 1365, 1367).

¶22 Clausell relies on *In re K.H.*, 1999 MT 128, 294 Mont. 466, 981 P.2d 1190, in urging

us to distinguish between Clinical and Forensic Pathology for purposes of whether an expert is qualified to testify at a homicide trial. Clausell's reliance is misplaced, if not disingenuous. In *K.H.*, we held that a social worker with no training regarding Native American culture was not a "qualified expert witness[]" as that term is used in 25 U.S.C. § 1912(f) of the Indian Child Welfare Act (ICWA). *K.H.*, ¶¶ 28-31. We noted, however, that the federal ICWA and its subsequently promulgated regulations and guidelines "add a dimension to expert testimony not normally required under Montana law." *K.H.*, ¶ 23 (internal citations and quotations omitted). Clearly, a "qualified expert witness" pursuant to the ICWA is not equivalent to an "expert by knowledge, skill, experience, training, or education" pursuant to Rule 702, M.R.Evid. Thus, *K.H.* is not applicable here.

¶23 Clausell cites no other legal authority for his assertion that a board certified clinical pathologist with four hundred autopsies to his credit, including forty gunshot wounds, is not qualified to offer expert testimony in a homicide case and we decline to adopt such a rule here. Therefore, we conclude the District Court did not abuse its discretion in accepting the qualifications of Dr. Schultz to testify as an expert witness.

¶24 Clausell also argues the District Court abused its discretion specifically in allowing Dr. Schultz to testify as to the probable orientation of the murder weapon based on the soot and powder burns and the angle of the bullet's trajectory through Trottier's skull and brain. He contends that, because Dr. Schultz did not examine the gun and was not qualified in forensics, such testimony was outside his area of expertise. However, as the State correctly responds, Clausell failed to contemporaneously object to the specific testimony about which he now complains.

¶25 In order to preserve an objection to the admission of evidence for appeal, the objecting party must make a timely and specific objection on the record. Rule 103(a)(1), M.R.Evid; *State v. Benson*, 1999 MT 324, ¶ 19, 297 Mont. 321, ¶ 19, 992 P.2d 831, ¶ 19. Pursuant to § 46-20-104(2), MCA, "[f]ailure to make a timely objection during trial constitutes a waiver of the objection except as provided in 46-20-701(2)." The reason for the contemporaneous objection rule of § 46-20-104(2), MCA, is to allow the district court an opportunity, where possible, to remedy any error and we will not put a trial court in error where it has not been given such a chance to correct itself, absent an exception to the rule. *See Benson*, ¶ 19. *See also State v. Stuit* (1996), 277 Mont. 227, 230, 921 P.2d 866, 868; *State v. Rodgers* (1993), 257 Mont. 413, 418-19, 849 P.2d 1028, 1032.

¶26 Clausell's sole objection to Dr. Schultz's testimony raised the issue of Dr. Schultz's

qualifications to testify as an expert at a homicide trial. Clausell has not previously argued that Dr. Shultz's specific testimony regarding soot and powder burns and the bullet trajectory was outside his area of expertise. Because Clausell has not argued that any of the exceptions set forth in § 46-20-701(2), MCA, apply here, he has waived any objection to this issue.

**¶27 2. Did the District Court err when it denied Clausell's motion for a directed verdict of acquittal?**

¶28 Section 46-16-403, MCA, permits the trial court in a criminal case to direct a verdict of acquittal only where the evidence is insufficient to support a finding or verdict of guilty. "The denial of a motion for a directed verdict is within the sound discretion of the trial court." *State v. Blackcrow*, 1999 MT 44, ¶ 18, 293 Mont. 374, ¶ 18, 975 P.2d 1253, ¶ 18. A directed verdict is not appropriate if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *Blackcrow*, ¶ 18.

¶29 At the end of the State's case-in-chief, Clausell moved for a directed verdict on the grounds that the State failed to introduce evidence upon which a jury could conclude that Clausell purposely or knowingly caused Trottier's death. The District Court denied the motion. On appeal, Clausell contends the District Court abused its discretion in denying his motion for a directed verdict because gunshot residue tests failed to establish that either Trottier or Clausell was holding the gun when it was discharged and there was no other evidence that Clausell was holding the gun when Trottier was shot. In addition, Clausell contends there was "no well-established motive to prove purpose or knowledge," and no evidence of flight.

¶30 In response, the State argues there was sufficient circumstantial evidence from which any rational trier of fact could infer that Clausell was holding the gun when Trottier was shot and that Clausell acted purposely or knowingly. The State also points out that neither motive nor flight are elements of deliberate homicide. We agree with the State on all counts.

¶31 We have held that "circumstantial evidence alone is sufficient to obtain a conviction." *State v. Lancione*, 1998 MT 84, ¶ 37, 288 Mont. 228, ¶ 37, 956 P.2d 1358, ¶ 37. Moreover, "criminal intent, being a state of mind, is rarely susceptible of direct or positive proof and therefore must usually be inferred from the facts testified to by witnesses and

the circumstances as developed by the evidence." S*tate v. Longstreth*, 1999 MT 204, ¶ 34, 295 Mont. 457, ¶ 34, 984 P.2d 157, ¶ 34 (citations omitted). Thus, the purposely or knowingly mental state required to support a criminal conviction may be inferred from circumstantial evidence such as the acts of the accused and the facts and circumstances surrounding the offense. *See* § 45-2-103(3), MCA; *State v. Sattler*, 1998 MT 57, ¶ 57, 288 Mont. 79, ¶ 57, 956 P.2d 54, ¶ 57. Finally, circumstantial evidence need only be of sufficient quality and quantity to legally justify a jury in finding guilt beyond a reasonable doubt, taking into consideration all of the facts and circumstances surrounding the charged offense collectively. *Lancione*, ¶ 37.

¶32 In *Lancione*, the defendant was charged with assaulting his business partner after an incident in which Lancione allegedly pushed the victim down a stairwell. At trial, Lancione contended the victim was trying to prevent him from leaving the building and both men tripped and fell down the stairwell together. *Lancione*, ¶¶ 7-10. Evidence was introduced at trial that Lancione confronted the victim in his office, followed him down the hall as he tried to leave and threatened that he would never make it to the street. Although there was evidence that the victim traveled a further distance down the stairs than was likely to result from a mere misstep, the victim testified he did not remember Lancione pushing him after being knocked unconscious by the fall. Lancione moved for a directed verdict, arguing there was no direct evidence that he assaulted the victim. The district court denied his motion and we affirmed, concluding sufficient circumstantial evidence existed from which the jury could infer Lancione caused the victim to fall down the stairwell. *Lancione*, ¶¶ 33-39.

¶33 In the present case, Clausell's version of the shooting at trial was that Trottier had the gun in her hand and it discharged when he struggled with her while attempting to remove her from his bedroom. However, the jury heard testimony that a gun powder residue test of Trottier's hands could not establish that she was holding the gun when it discharged. The residue test was similarly inconclusive as to Clausell, but he admitted at trial that he washed his hands upon arriving at the hospital. Moreover, Dr. Schultz testified the bullet trajectory was such that Trottier would have to have been holding the gun with her non-dominant hand and at an awkward angle to have inflicted the wound herself.

¶34 The jury also heard testimony at trial that Clausell recounted at least eight different versions of the facts that were inconsistent with each other and with the physical evidence. The jury heard testimony that Clausell and Trottier had been involved in a physical altercation at a bar earlier on the evening of the shooting and that Trottier had driven to

Clausell's apartment that night and confronted him. Finally, Clausell admitted at trial that he concealed the gun at his apartment before taking Trottier to the hospital. Thus, strong circumstantial evidence was introduced at trial from which the jury could decline to accept Clausell's version of the facts and infer instead that he shot Trottier.

¶35 We conclude from this record, when viewed in the light most favorable to the State, that sufficient circumstantial evidence existed upon which any rational trier of fact could determine beyond a reasonable doubt that Clausell purposely or knowingly caused Trottier's death. *See Blackcrow*, ¶ 18. Furthermore, Clausell's assertions to the contrary notwithstanding, neither motive nor flight are elements of the crime of deliberate homicide. *See* § 45-5-102(1)(a), MCA. We conclude, therefore, that the District Court did not abuse its discretion when it denied Clausell's motion for a directed verdict of acquittal.

¶36 **3. Did the District Court erroneously instruct the jury on the definition of "purposely?"**

¶37 We review a claim of instructional error in a criminal case to determine "whether the instructions, as a whole, fully and fairly instruct the jury on the law applicable to the case." *State v. Johnson*, 1998 MT 289, ¶ 28, 291 Mont. 501, ¶ 28, 969 P.2d 925, ¶ 28 (citations omitted). Furthermore, a trial court has broad discretion when it instructs a jury. *Johnson*, ¶ 28.

¶38 In the present case, the District Court instructed the jury that "a person commits the offense of DELIBERATE HOMICIDE if he purposely or knowingly causes the death of another human being." The District Court then instructed the jury on the definition of purposely as follows: "A person acts purposely with respect to deliberate homicide if it is his conscious object to cause death or a similar type of harm to another human being." Incident to giving these instructions, the District Court refused Clausell's proposed jury instruction on the elements of deliberate homicide, including intent.

¶39 Clausell argues the jury was not properly instructed on the definition of "purposely," because the word "similar" does not appear in the statutory definitions of "purposely" or "deliberate homicide." He contends the jury instruction given lowered the State's burden of proving every element of the crime charged beyond a reasonable doubt. We disagree.

¶40 Clausell was charged with violation of § 45-5-102, MCA, which provides, in pertinent part, as follows:

**45-5-102. Deliberate Homicide. (1) A person commits the offense of deliberate homicide if:**

(a) the person purposely or knowingly causes the death of another human being . . . .

Montana Code defines "purposely" as follows:

**45-2-101. General definitions. (64) "Purposely"--a person acts purposely with respect to a result or to conduct described by a statute defining an offense if it is the person's conscious object to engage in that conduct or to cause that result. When a particular purpose is an element of an offense, the element is established although the purpose is conditional, unless the condition negatives the harm or evil sought to be prevented by the law defining the offense. Equivalent terms, such as "purpose" and "with the purpose", have the same meaning.**

Both parties cited *State v. Rothacher* (1995), 272 Mont. 303, 901 P.2d 82, as authority for their respective proposed instructions regarding deliberate homicide and intent.

¶41 In *Rothacher*, we noted that the statutory definitions of deliberate homicide and purposely and knowingly must be read with § 45-2-201, MCA, which provides, in pertinent part, as follows:

(2) If purposely or knowingly causing a result is an element of an offense and the result is not within the contemplation or purpose of the offender, either element can nevertheless be established if:

. . . .

(b) the result involves the same kind of harm or injury as contemplated but the precise harm or injury was different or occurred in a different way, unless the actual result is too remote or accidental to have a bearing on the offender's liability or on the gravity of the offense.

We clarified our previous line of decisions applying these statutes and held that the mental state for deliberate homicide can be established if the result involves the same or similar kind of harm or injury as contemplated by the defendant, although the actual degree of injury is greater than intended. *Rothacher*, 272 Mont. at 306-07, 901 P.2d at 84-85; *see also State v. Lantis*, 1998 MT 172, ¶ 35, 289 Mont. 480, ¶ 35, 962 P.2d 1169, ¶ 35.

¶42 Thus, pursuant to *Rothacher*, the District Court did not lower the State's burden when it instructed the jury that a person acts purposely with respect to deliberate homicide if it is his conscious object to cause death or a similar type of harm. We conclude, therefore, that the District Court did not abuse its discretion in instructing the jury on the definition of "purposely."

¶43 **4. Did the State prejudice Clausell's right to a fair and impartial trial by commenting on facts not of record?**

¶44 Clausell next argues the prosecutor made two improper statements during closing arguments in which he discussed and commented on evidence not of record, prejudicing Clausell's constitutional right to a fair trial. However, as the State correctly points out, Clausell asserts this argument for the first time on appeal.

¶45 Again, pursuant to § 46-20-104(2), MCA, if a party fails to timely object at trial the objection is waived. Clausell failed to contemporaneously object to either of the statements about which he now complains. Nor did Clausell assert error after closing arguments, either by objection or motion to strike or for a mistrial. Because he has not argued any of the exceptions to the contemporaneous objection rule set forth in § 46-20-701(2), MCA, apply here, we conclude this issue is not properly before us on appeal.

¶46 **5. Did the District Court err when it admitted the testimony of police officer Steve Swanson regarding pre-*Miranda* statements made by Clausell?**

¶47 Billings Police Officer Steve Swanson was the first police officer to respond once hospital personnel informed the police there was a gunshot victim in the emergency room. At trial, Officer Swanson testified regarding the initial conversation he had with Clausell in which Clausell recounted a version of the events leading up to Trottier's injury inconsistent with the version he recounted at trial.

¶48 On appeal, Clausell argues that Officer Swanson failed to read him the *Miranda* warnings before they spoke and, therefore, that the testimony should have been stricken from the record. However, Clausell fails to support this argument with any analysis of or citation to legal authority as required by Rule 23(a)(4), M.R.App.P. We have previously held that the obligation to establish error by a district court falls squarely on the appellant. *See State v. Carter* (1997), 285 Mont. 449, 461, 948 P.2d 1173, 1180. It is not this Court's obligation to conduct legal research on an appellant's behalf or to develop legal analysis

that may lend support to his position. *Johansen v. State, Dept. of Natural Resources*, 1998 MT 51, ¶ 24, 288 Mont. 39, ¶ 24, 955 P.2d 653, ¶ 24 (citing *Carter*, 285 Mont. at 461, 948 P.2d at 1180). Without citation to legal authority, Clausell fails to establish error.

¶49 Moreover, Clausell failed to object at trial or otherwise raise this issue before the trial court. Because Clausell does not argue that any exception to the contemporaneous objection rule is applicable, his arguments are not properly before us. *See* section 46-20-104(2), MCA. Clausell having failed to support his argument with citation to legal authority and having failed to preserve the issue for appeal, we decline to address this issue further.

¶50 **6. Did the State violate Clausell's right to due process and privilege against self-incrimination by commenting on Clausell's post-*Miranda* silence and is this issue reviewable under the common law plain error doctrine?**

¶51 As a preliminary matter, Clausell concedes he failed to object at trial to any of the comments about which he now complains. Rather, he contends this issue should be reviewed under the common law doctrine of plain error pursuant to *State v. Finley* (1996), 276 Mont. 126, 915 P.2d 208. In *Finley*, we articulated the common law exception to the contemporaneous objection rule as follows:

> [T]his Court may discretionarily review claimed errors that implicate a criminal defendant's fundamental constitutional rights, even if no contemporaneous objection is made and notwithstanding the inapplicability of the § 46-20-701(2), MCA, criteria, where failing to review the claimed error at issue may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process.

*Finley, 276 Mont. at 137, 915 P.2d at 215 (followed in State v. Sullivan (1996), 280 Mont. 25, 31, 927 P.2d 1033, 1037-38).*

¶52 In *Finley*, as in the present case, the defendant argued that statements made by the prosecution during trial regarding the defendant's post-arrest silence violated his right to due process and privilege against self-incrimination. *Finley*, 276 Mont. at 132, 915 P.2d at 212. After observing in *Finley* that the right to due process and the privilege against self-incrimination are both, undeniably, fundamental constitutional rights, we concluded that failure to review such claims would have left unsettled a question as to the fundamental fairness of the trial. *Finley*, 276 Mont. at 138, 915 P.2d at 216. Because Clausell's claims

of error in the present case mirror those of the defendant in *Finley*, we conclude plain error review is appropriate in this case.

¶53 We note that we have recently declined to apply the common law plain error doctrine to review a defendant's assertions that prosecutorial comment on the defendant's post-*Miranda* silence violated his right to due process and his privilege against self-incrimination. *State v. Baker*, 2000 MT 307, ___ Mont.___, 15 P.3d 379. In *Baker*, we acknowledged that the defendant's argument implicated fundamental rights, but concluded the defendant had failed to demonstrate that any fundamental unfairness would result if the issue were not reviewed because his claims of error had no merit. *Baker*, ¶¶ 14-15. By contrast, in *Finley*, 276 Mont. at 138, 915 P.2d at 216, and again in *Sullivan*, 280 Mont. at 32-33, 927 P.2d at 1037-38, we concluded that failure to apply plain error to review a defendant's claim of prosecutorial comment on post-*Miranda* silence would be fundamentally unfair precisely because the rights at issue were so important.

¶54 This apparent inconsistency in our application of plain error doctrine is not isolated. It seems that in some cases we invoke plain error merely because the claimed error implicates a right so fundamental that failure to review would be fundamentally unfair, *see, e.g.*, *State v. Brown*, 1999 MT 31, ¶ 12, 293 Mont. 268, ¶ 12, 975 P.2d 321, ¶ 12; *Finley*, 276 Mont. at 138, 915 P.2d at 216; *Sullivan*, 280 Mont. at 32-33, 927 P.2d at 1037-38, while in other cases we review the merits of a claimed error which implicates fundamental constitutional rights before determining whether fundamental fairness and justice requires the invocation of plain error doctrine. *See, e.g., Baker*, ¶¶ 14-19*, State v. Hart*, 2000 MT 332, ¶¶ 50-53, ___ Mont. ___, ¶¶ 50-53, 15 P.3d 917, ¶¶ 50-53. *Compare also State v. Weaver*, 1998 MT 167, ¶¶ 23-27, 290 Mont. 58, ¶¶ 23-27, 964 P.2d 713, ¶¶ 23-27; *with State v. Harris*, 1999 MT 115, ¶¶ 10-12, 294 Mont. 397, ¶¶ 10-12, 983 P.2d 881, ¶¶ 10-12. In a third group of cases, we forgo analysis and simply decline to exercise our discretionary power of plain error without comment, regardless of whether fundamental rights were implicated by a claimed error. *See, e.g., State v. Weaselboy*, 1999 MT 274, ¶ 17, 296 Mont. 503, ¶ 17, 989 P.2d 836, ¶ 17; *State v. Herrera*, 1998 MT 1180, ¶¶ 18-20, 289 Mont. 499, ¶¶ 18-20, 962 P.2d 1180, ¶¶ 18-20.

¶55 That said, it is unnecessary to resolve this inconsistency here--neither party has argued that *Baker* is applicable and the State concedes that plain error review is appropriate in the present case. Rather, we will leave the clarification of our plain error jurisprudence to a future case, inviting other litigants to address and brief this issue. We turn, therefore, to Clausell's substantive arguments.

¶56 Relying on *Doyle v. Ohio* (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d. 91, Clausell argues the State violated his right to due process and his privilege against self-incrimination by improperly commenting on his silence after having received *Miranda* warnings. In *Doyle*, a state prosecutor sought to impeach the defendants' exculpatory statements offered for the first time at trial by asking the defendants on cross-examination why they had failed to offer such explanations at the time of arrest. *Doyle*, 426 U.S. at 616-17, 96 S.Ct. at 2243-44. The United States Supreme Court held that, because *Miranda* warnings carry the implicit assurance that silence will carry no penalty for a defendant who chooses not to make a statement, it would be fundamentally unfair and a deprivation of due process to allow the prosecution to use an arrested person's silence to impeach an explanation subsequently offered at trial. *Doyle*, 426 U.S. at 618, 96 S.Ct. at 2245.

¶57 Our application of the *Doyle* rule in *Sullivan*, is instructive to the present discussion. There, the prosecution elicited testimony during its case-in-chief that the defendant twice refused to give a statement to investigating law enforcement officers after having received *Miranda* warnings. The prosecution also commented on the defendant's refusal to give a statement during opening and closing arguments, in both cases implying the defendant would have spoken to law enforcement officials if he were innocent. *Sullivan*, 280 Mont. at 29-31, 927 P.2d at 1036. We concluded the testimony and the opening and closing statements constituted *Doyle* error and violated the defendant's due process rights and privilege against self incrimination. *Sullivan*, 280 Mont. at 36-37, 927 P.2d at 1040.

¶58 Although not entirely clear, Clausell appears to assert there were three separate instances in the present case where the prosecution impermissibly commented on Clausell's post-*Miranda* silence: during the State's case-in-chief and during opening and closing arguments. The State responds that Clausell has not pointed to any instance in which the prosecution commented on his refusal to give a statement after he received *Miranda* warnings and, therefore, there is no *Doyle* error. We agree.

¶59 Clausell's first assertion of *Doyle* error stems from the State's examination of Detective Ronald Cummings. Detective Cummings testified regarding Clausell's formal arrest and the subsequent investigation. The prosecutor asked whether the police department followed an arrest procedure and Detective Cummings responded that Clausell was advised of his rights, invoked his right to an attorney and was not questioned further after that. However, Detective Cummings did not otherwise mention the *Miranda* warnings in his testimony. Unlike the situations in *Doyle* and *Sullivan*, at no point during the direct or re-direct examination did either Detective Cummings or the prosecutor

suggest or imply that Clausell refused to give a statement after requesting an attorney. Clausell, on the other hand, testified that he tried to make further statements after invoking his right to counsel, but that police refused to talk to him. Indeed, part of Clausell's defense was to draw attention to his willingness to cooperate with police. Thus, not only does the record fail to support Clausell's assertion that the prosecution commented his post-*Miranda* silence, it does not support his assertion that he was silent after he received *Miranda* warnings.

¶60 Clausell next asserts the State committed *Doyle* error when, during opening arguments, the prosecutor commented that Clausell did not refer to a gun or a gunshot wound when telling hospital personnel how Trottier was injured. Importantly, Clausell does not suggest the prosecutor commented on his refusal to give a statement. Rather, Clausell asserts the prosecutor commented on his omission of a crucial fact--that Trottier had been shot--in earlier statements. We have previously observed that the *Doyle* rule "does not apply to language that merely inquires into prior inconsistent statements. Such comment makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent." *State v. Wimen* (1989), 236 Mont. 180, 187, 769 P.2d 1200, 1204 (citing *Anderson v. Charles* (1980), 447 U.S. 404, 408, 100 S.Ct. 2180, 2188, 65 L.Ed.2d 222). The fact that Clausell did not mention a gun in one or more of his statements is not silence and the *Doyle* rule cannot be applied to preclude the State in the present case from comparing Clausell's inconsistent statements.

¶61 Moreover, Clausell gave five different accounts of how Trottier was injured between arriving at the hospital and being arrested and *Mirandized*. Thus, he had not received *Miranda* warnings prior to making any of the statements which the State referred to in opening arguments. The *Doyle* rule is limited to only those instances where the prosecution seeks to impeach a defendant's testimony based on silence after *Miranda* warnings were given. *See Fletcher v. Weir* (1982), 455 U.S. 603, 607, 102 S.Ct. 1309, 1311-12, 71 L.Ed.2d 490; *and Finley*, 276 Mont. at 139, 915 P.2d at 216. Thus, the prosecutor's comment on Clausell's failure to mention a gun or gunshot wound to medical personnel before police arrived was a comment on Clausell's pre-*Miranda* statements, rather than on post-*Miranda* silence and, therefore, did not constitute *Doyle* error.

¶62 Finally, Clausell asserts the State committed *Doyle* error during closing arguments when the prosecution commented that Clausell's version of the facts at trial was inconsistent with the versions he gave earlier to hospital personnel and police, implying

that he had spent the seven months between the shooting and trial thinking of a believable story. Again, no construction of the *Doyle* rule can be read to preclude the State from comparing the inconsistent, voluntary statements of a defendant. *See Wimen*, 236 Mont. at 187, 769 P.2d at 1204.

¶63 On this record, we conclude Clausell has failed to establish that the State improperly commented on his pos*t-Miranda* silence pursuant to *Doyle*. We hold, therefore, that the State did not violate Clausell's right to due process or his privilege against self-incrimination.

CONCLUSION

¶64 In summary, we hold the District Court did not abuse its discretion in admitting the testimony of the State's expert pathologist, in denying Clausell's motion for a directed verdict or in instructing the jury on the definition of "purposely;" we conclude Clausell's arguments that the prosecutor commented on evidence not of record and that the District Court improperly admitted testimony regarding Clausell's pre-*Miranda* statements are not properly before us on appeal and we decline to consider them; and we hold the State did not improperly comment on Clausell's post-*Miranda* silence in violation of his right to due process and privilege against self incrimination. Accordingly, we affirm Clausell's conviction and sentence.

¶65 Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ KARLA M. GRAY

/S/ TERRY N. TRIEWEILER

/S/ JIM REGNIER