FILED

January 21 2009

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 08-0119

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 15

STATE OF MONTANA,

Plaintiff and Appellee,

v.

COREY DUSTIN ALLUM,

Defendant and Appellant.

APPEAL FROM: District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-2007-301
Honorable Ed McLean, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Jim Wheelis, Chief Appellate Defender, Roberta R. Zenker, Assistant
Appellate Defender, Helena, Montana

For Appellee:

Hon. Steve Bullock, Montana Attorney General, Tammy K. Plubell;
Assistant Attorney General, Katherine Aldrich, Legal Intern,
Helena, Montana

Fred R. Van Valkenburg, Missoula County Attorney, Susan E. Boylan,
Deputy County Attorney, Missoula, Montana

Submitted on Briefs: December 10, 2008

Decided: January 21, 2009

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1   Corey Dustin Allum (Allum) was charged with felony aggravated assault in connection with the injury of a twenty-month-old child. At the close of the State's case-in-chief, Allum moved to dismiss on the ground that the State had failed to produce sufficient evidence upon which a reasonable jury could conclude that he acted purposely or knowingly. The Fourth Judicial District Court for Missoula County denied the motion. The jury convicted Allum of the charge. He appeals. We affirm.

## ISSUE

¶2   The dispositive issue on appeal is whether the District Court erred when it denied Allum's motion to dismiss.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3   In July 2007, Corey Allum and S.W., mother of twenty-month-old A.W., had been living together in Allum's grandparents' basement apartment in Missoula, Montana, for a few months. Allum had baby-sat A.W. on several occasions during these months while S.W. was at work. However, on July 25, 2007, while Allum was baby-sitting, A.W. was severely injured in the basement apartment. Allum's grandfather drove Allum and A.W. to a local hospital where A.W., who was vomiting, and bleeding from her nose and ear, was diagnosed with a complex skull fracture. She also had two bruised eyes, a bruised cheek and a swollen lip. After leaving Allum and A.W. at the hospital, Allum's grandfather picked up S.W. from work and took her to the hospital.

¶4   Allum initially reported to the hospital emergency room doctor that A.W. had taken a "swan dive" off the coffee table and been injured. Over the course of several

2

minutes, however, Allum described the event differently to various hospital staff members. Concerned about Allum's changing descriptions and the severity of the child's injuries, a hospital staffer called the police. A sheriff's deputy and a deputy in training with the Missoula County Sheriff's Department arrived at the hospital and questioned Allum. According to the officers, Allum appeared nervous and was unable to make eye contact.

¶5 Because the child's injuries were severe and potentially life-threatening, the attending physician arranged for A.W. to be air-lifted by helicopter to Sacred Heart Children's Hospital in Spokane, Washington, to be under the care of a neurosurgeon in a pediatric intensive care unit. A.W. remained at Sacred Heart for five or six days. Upon A.W.'s departure to Spokane, both Allum and S.W., who was unable to accompany her daughter on the flight, consented to go to the sheriff's office for interviews.

¶6 Detective McDermott first interviewed S.W. and discerned that she had not been present nor did she have any first hand knowledge of the cause of her child's injuries. McDermott next interviewed Allum for approximately one hour and fifteen minutes. This interview was videotaped and later transcribed. McDermott testified that Allum was nervous, fidgety and avoided eye contact. McDermott stated that he was unable to get a consistent linear chronology of what had occurred that night and that Allum rambled. McDermott noted, however, that Allum denied being angry with the child and said that she had not been misbehaving. McDermott reported that while describing how she was injured during the course of the interview, Allum gave inconsistent descriptions. For example, Allum said that he did not see A.W. fall because he was reaching for a

magazine. He later said he was reaching for the remote control for the television. Contrary to the story he told the emergency room doctor, he told McDermott that A.W. fell forward off a cushion-less armchair on which she frequently played and hit the coffee table but later said she fell backward and hit the floor. Eventually, he told McDermott that he had picked her up after she had fallen off the chair but had dropped her on the coffee table on the way to the couch, after tripping over a toy or "something" on the floor. Subsequently, he admitted to dropping her on the table twice. Allum repeatedly told McDermott that he had never hurt A.W. before nor would he ever hurt a child out of anger or frustration. As the interview was drawing to a close, Allum admitted that he was angry with A.W. and she was not behaving very well, but he repeatedly stated he did not injure her "on purpose." He also stated several times that he did not want S.W. to lose custody of A.W. or to leave him, nor did he want to go to jail over "something [he] did" or something he "caused." McDermott arrested Allum at the end of the interview.

¶7 McDermott interviewed Allum again on the following day. This interview was also videotaped. Allum's description of the events continued to change and expand. At this interview, Allum admitted he may have shaken A.W. He also revealed that he may have dropped her on the table as many as three times, may have fallen on top of her, may have stepped on her and may have hit her in the face with his knee or elbow after dropping her.

¶8 On August 15, 2007, Allum was charged by Information with felony aggravated assault of A.W., in violation of § 45-5-202(1), MCA, which provides that a person commits the offense of aggravated assault if the person purposely or knowingly causes

4

serious bodily injury to another or purposely or knowingly, with the use of physical force or contact, causes reasonable apprehension of serious bodily injury or death in another. An attorney with the Office of the Public Defender represented Allum and a trial was held on November 26 and 27, 2007. The jury heard testimony from the Missoula hospital doctor and nurse, the responding law enforcement officers, and S.W. regarding the extent of A.W.'s injuries and Allum's contradictory descriptions. The jurors also heard McDermott's testimony pertaining to Allum's interviews and viewed the videotapes of these interviews. Lastly, the jury heard testimony from Allum's aunt and two cousins who described previous and separate occasions in which they had witnessed Allum physically and verbally abuse A.W. In addition, photographs of the room in which A.W. was injured, showing the low coffee table and the armchair from which A.W. allegedly fell, were submitted to the jury.

¶9 At the close of the State's case-in-chief, and outside the presence of the jury, Allum moved for dismissal, arguing that the State had failed to present any evidence that he had acted voluntarily in such a way as to cause A.W.'s injuries, and that such a voluntary act was an essential element of the crime of aggravated assault. He further asserted that he could not be convicted solely on the basis that he had made inconsistent statements about the event. The District Court denied the motion. The jury returned a guilty verdict. Allum filed a timely appeal.

**STANDARD OF REVIEW**

¶10 Allum and the State dispute the appropriate standard of review of a district court's denial of a motion to dismiss for insufficient evidence. Allum argues that the standard is

5

an abuse of discretion, while the State submits that the standard is de novo. As we explained in *State v. Rosling*, 2008 MT 62, ¶ 33, 342 Mont. 1, ¶ 33, 180 P.3d 1102, ¶ 33, this question was resolved in *State v. Swann*, 2007 MT 126, 337 Mont. 326, 160 P.3d 511, in which we clarified that the proper standard of review of a denial of a motion to dismiss for insufficient evidence is de novo.

## DISCUSSION

¶11    *Did the District Court err when it denied Allum's motion to dismiss?*

¶12    Allum argues that to establish guilt under the aggravated assault statute at § 45-5-202, MCA, the State must prove that he performed a "voluntary act" that resulted in A.W.'s injuries. Section 45-2-202, MCA, provides, in relevant part, that "[a] material element of every offense is a voluntary act, which includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing." Moreover, Allum correctly cites to numerous cases that establish a "voluntary act" as an essential element of any criminal offense. *See e.g. State v. Fitzpatrick*, 149 Mont. 400, 403, 427 P.2d 300, 302 (1967), *State v. Korell*, 213 Mont. 316, 690 P.2d 992 (1984). He asserts that the State failed to prove that A.W.'s injuries were the result of a voluntary act by him rather than an accident.

¶13    Allum proffers that the evidence presented to the jury consisted of the extent of the child's injuries, his inconsistent statements to the police, and his aunt's and cousins' assertions of his prior conduct with A.W. Acknowledging that the evidence may show negligence, Allum argues that the State failed to make a causal connection between a voluntary act by him and A.W.'s injuries. He further submits that inconsistent statements

alone are insufficient to support a conviction as such statements do not establish the required voluntary act.

¶14 The State does not dispute that it must prove a "voluntary act" on Allum's behalf; rather, it counters that the totality of the circumstantial evidence along with the severity of A.W.'s injuries established that Allum had the requisite "purposely or knowingly" mental state, and that this mental state led to voluntary actions causing serious bodily injury to A.W. The State maintains that a person acts "purposely" when it is the person's conscious object to cause such a result, and he or she acts "knowingly" when the person is aware there exists the high probability that his or her conduct will cause a specific result. Sections 45-2-101(65) and (35), MCA, respectively.

¶15 The State further asserts that circumstantial evidence alone may be sufficient to obtain a conviction as long as such evidence is of a quality and quantity to justify a determination of guilt beyond a reasonable doubt. It continues that voluntariness and intent can be proven by circumstantial evidence, as occurred in *State v. Lancione*, 1998 MT 84, ¶ 39, 288 Mont. 228, ¶ 39, 956 P.2d 1358, ¶ 39, and *State v. Clausell*, 2001 MT 62, ¶ 31, 305 Mont. 1, ¶ 31, 22 P.3d 1111, ¶ 31. Moreover, the State submits that competent circumstantial evidence may be given the same weight as direct evidence. *State v. Cor*, 144 Mont. 323, 326-27, 396 P.2d 86, 88 (1964).

¶16 The State disputes Allum's contention that its case was based solely on his prior inconsistent statements and that his conviction cannot stand on inconsistent statements alone. The State posits that Allum's inconsistent statements were neither the sole basis of

the State's case, nor the sole reason for his conviction but rather were an element of the totality of the evidence introduced, all of which supported his conviction.

¶17     In *Lancione*, Lancione and his employer, Khalsa, got into a heated argument over a sales commission. After the argument, as Khalsa was leaving the building, Lancione followed him down five flights of stairs, threatening him by saying Khalsa would "not make it to the street." Following this exchange, Khalsa regained consciousness at the foot of the stairs, lying in a pool of blood. The jury convicted Lancione of criminal endangerment and we affirmed. We noted that while Khalsa did not recall Lancione pushing him, the evidence established that Lancione was angry with Khalsa, had followed him into the stairwell and had threatened him. While Lancione claimed that he accidently tripped into Khalsa and both of them fell down the stairs, we held that the circumstantial evidence presented to the jury was sufficient to conclude that Lancione had caused Khalsa's injuries by pushing Khalsa down a flight of stairs. *Lancione*, ¶ 39.

¶18     In *Clausell*, Clausell transported Georgiana Trottier (Trottier), with whom he had been having an intimate relationship, to a Billings' hospital emergency room where she later died of a gunshot wound to her head. Clausell remained at the hospital while doctors treated Trottier and was questioned when responding police officers arrived. While at the hospital and during the ensuing investigation, Clausell gave numerous inconsistent descriptions about Trottier's shooting to hospital personnel, police officers, and friends, all of whom testified at trial. Officers arrested Clausell the morning of the incident and during the search of Clausell's apartment, the police found the gun used in the shooting, matching ammunition in Clausell's closet, a life insurance policy on Trottier

8

with Clausell named as beneficiary, and the victim's blood throughout Clausell's bedroom. Clausell argued at trial that Trottier's death had been a "tragic accident," occurring as he was attempting to physically remove her from his bedroom after denying her request to spend the night with him. He claimed that unbeknownst to him she had his gun in her hand and it accidently discharged into the back of her head as he was trying to remove her. In addition to other evidence, the jury heard testimony that the location of the wound belied self-infliction. It subsequently convicted Clausell of deliberate homicide. We affirmed on appeal stating that sufficient circumstantial evidence existed upon which any rational trier of fact could determine beyond a reasonable doubt that Clausell purposely or knowingly caused Trottier's death, (*Clausell*, ¶ 35); therefore the district court did not err when it denied Clausell's motion for a directed verdict of acquittal.

¶19 Allum maintains that the quality and quantity of evidence presented to the jury in his case was not nearly as significant as that presented in *Lancione*. He states that "the circumstantial evidence is that a none too experienced care giver with an anger management problem left to care for a toddler on his own could not account for her severe injuries, and instead gave inconsistent, implausible statements," but that this evidence does not "show that [Allum] took some act to bring the injury about." Allum acknowledges that his explanations "were neither plausible nor consistent," and that it is unlikely that A.W. could injure herself as badly as was the case, but asserts that this does not prove that he "did anything"; therefore the judgment and jury verdict should be vacated and the case should be dismissed.

¶20 Additionally, he opines that *Clausell* is distinguishable. He asserts that in *Clausell*, it was obvious that Trottier was injured by gunfire but in this case, "we do not know the cause of A.W.'s injury, except that it was caused by blunt force," and "[u]nlike gunfire, the cause of the blunt force, whether A.W. fell, something or someone fell on her, or she was struck, remains unknown." He continues that, "[i]n *Clausell*, the jury could say that because they did not believe Clausell, that he was the one who shot the victim. Here, the jury could say that they did not believe Allum, but, it could not say what happened or that he did anything."

¶21 We disagree and find both *Lancione* and *Clausell* to be apposite in this case. While a different level of circumstantial evidence was presented in *Lancione*, the circumstantial evidence presented here was significant and sufficient to support a conviction. It was clearly established that A.W. was not injured when Allum picked her up from daycare and returned home with her, whereas she was seriously injured when she and Allum emerged from the basement apartment several hours later. It was undisputed that Allum was the only person in the basement with her. Allum admitted to McDermott that he was angry and frustrated with the child and that he had spanked her earlier in the evening. Family members testified that Allum, on previous occasions, had kicked the child and been physically rough with her as well as verbally abusive. Furthermore, Allum's inconsistent descriptions of the event with expanding revelations to McDermott of how A.W. "may have" been injured, including that he "may have" dropped her on the table as many as three times, fallen on top of her, stepped on her, and hit her with his elbow and knee, justified the jury's skepticism of his truthfulness. While claiming that he

10

"must have" tripped on something on the way to the couch causing him to drop her and fall on top of her, the pictures taken at the scene reveal nothing on the floor for him to trip over. Additionally, this would not explain how he dropped her a second or third time onto the table. The doctor and nurse testified as to the severity of her injuries, some of which were on her face and others to the back of her skull, indicating two different occasions of injury. After viewing the pictures of the coffee table and the armchair which showed them both to be close to the floor, the jury could reasonably conclude that a fall from either of these pieces of furniture onto a carpeted floor could not have inflicted the level of injury experienced by this child. Moreover, just as Trottier could not have inflicted the fatal gunshot wound to herself, A.W. could not have inflicted upon herself these serious injuries.

¶22 Therefore, we conclude the circumstantial evidence presented in this case was of such a quality and quantity that a jury could decline to accept Allum's declaration that A.W.'s injuries were self-inflicted or caused "accidently," and conclude instead that Allum caused them purposely and knowingly.

## CONCLUSION

¶23 For the foregoing reasons, we affirm the District Court's denial of Allum's motion for dismissal.

/S/ PATRICIA COTTER

11

We concur:


/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ BRIAN MORRIS